**UNITED STATES** of America and Thurston Snyder and James H. Lawhn, Special Agents, Internal Revenue Service, Plaintiffs,

v.

**J. A. DONNELLEY**, Defendant.

**Civ. No. 706.**

United States District Court
D. Nevada.

Feb. 2, 1965.

John W. Bonner, U. S. Atty., Las Vegas, Nev., Robert S. Linnell, Asst. U. S. Atty., Las Vegas, Nev., Michael DeFeo, Sp. Asst. U. S. Atty., Las Vegas, Nev., for plaintiffs.

J. A. Donnelley, San Diego, Cal., for defendant.

ROGER D. FOLEY, District Judge.

On April 1, 1964, pursuant to 26 U.S.C. § 7602(2), the Internal Revenue Service issued an administrative subpoena in connection with its investigation of the tax liability of Wilbur I. Clark and Moe B. Dalitz for the period 1953–1962, inclusive, requiring the Defendant to produce, at Las Vegas, Nevada, on April 20, 1964, the following:

> "Your records relating to the receipt and disbursement of funds, including ledger accounts, journal records, bank statements, loan records, bank deposit · receipts or tags, cancelled checks, correspondence received and sent, memoranda made, and copies of accountings and billings of fees and costs and any other records of any and all financial transactions with or on behalf of Wilbur Clark, Moe B. Dalitz, Martinolich Construction Company, Refrigerated Transport Co., Martinolich Shipbuilding Co., and Atlantida."

On September 29, 1964, the Government filed herein a petition to enforce the Internal Revenue summons under 26 U.S.C. § 7604(a), alleging:

(a) That Special Agents of the Internal Revenue Service, Thurston Snyder and James H. Lawhn, had been conducting an investigation of the income tax liability of Wilbur I. Clark for the years 1953–1962, inclusive, and of Moe B. Dalitz for the year 1961, for the purpose of ascertaining the correctness of the

income tax returns as filed by said taxpayers;

(b) That Defendant is an attorney representing said taxpayers and has in the past been involved in numerous financial transactions on taxpayers' behalf, and as a result, has, in his possession, numerous financial records, including the records of the corporations named in the summons in which the taxpayers have been involved, which records have a direct financial relationship to the correctness of the taxpayers' returns; and

(c) That Defendant has failed to produce the records demanded.

Following the issuance of an Order to Show Cause why the Defendant should not comply with the administrative summons, Defendant answered admitting that the agents had been conducting the said investigation of taxpayers as alleged in the petition and that as an attorney-at-law, he had represented the taxpayers and had been involved in financial transactions on their behalf and has in his possession records of financial transactions concerning taxpayers. The Defendant alleges that he does not know whether the records of the corporations in his possession have any relation, direct or otherwise, to the correctness of the income tax returns of the taxpayers.

This Court conducted a hearing upon an order to show cause on the 6th day of November, 1964, and heard arguments of counsel on January 13, 1965. Following the filing of final briefs, the matter stood submitted on January 25, 1965. Counsel have stipulated that the records of the corporation described in the summons as Atlantida are no longer sought and may be disregarded.

The Government has stipulated to limit the scope of their request for production to the books, records and papers described in the summons, in the possession of the Defendant, of financial transactions of each of the taxpayers with each of three corporations, to wit, Martinolich Construction Company, Refrigerated Transport Co. and Martinolich Shipbuilding Co., and to financial transactions among the three corporations that bear, directly or indirectly, upon the financial transactions of either or both of the taxpayers for the period involved, excluding financial transactions among the three corporations and between any of the three corporations and third parties that in no way pertain to or bear upon or affect the financial transactions of either or both of the taxpayers.

From uncontroverted evidence, the Court makes the following findings of fact:

1. That Clark, during the period involved, first owned one-half of the stock of Martinolich Construction Company, Anthony Martinolich owning the other one-half, and later, about 1955, Clark became the owner of all the stock of this corporation.

2. That Martinolich Construction Company borrowed, apparently without interest, approximately Four Hundred Fifty Thousand Dollars ($450,000) from Refrigerated Transport Co. between 1952 and 1955.

3. That the original officers of Refrigerated Transport Co. were Anthony Martinolich, his son and the Defendant. Martinolich and son owned the controlling stock.

4. That Martinolich and wife owned approximately sixty per cent of the stock in Martinolich Shipbuilding Co.

5. That Martinolich Shipbuilding Co. loaned as much as Three Hundred Thousand Dollars ($300,000) from time to time to Martinolich Construction Company.

6. That Martinolich Shipbuilding Co. owed Martinolich Construction Company approximately Sixty Thousand Dollars ($60,000) to Seventy Thousand Dollars ($70,000) at the time when Clark acquired Martinolich' stock in Martinolich Construction Company.

7. That Martinolich and other stockholders liquidated and dissolved Martinolich Shipbuilding Co., but retained a ship's charter, which Clark and others used to export slot machines to Germany

in 1960 in the name of Refrigerated Transport Co.

8. That Dalitz had an interest in the Colonial House Motel in Las Vegas; that about 1954 or 1955, at a cost of approximately Two Hundred Thousand Dollars ($200,000), Martinolich Construction Company was employed to build an addition to the Colonial House Motel, borrowing Two Hundred Thousand Dollars ($200,000) from Refrigerated Transport Co. for this construction; that Dalitz assumed and paid this amount to the Martinolich Construction Company; that Martinolich Construction Company forgave Dalitz the interest in the approximate amount of Twelve Thousand Dollars ($12,000); that at the time this interest was forgiven, Clark wholly owned Martinolich Construction Company; that Dalitz gave his personal check to the Defendant for Two Hundred Thousand Dollars ($200,000) to Martinolich Construction Company; that Defendant opened a special bank account in San Diego, California, in the name of Martinolich Construction Company on a signature card reflecting the signature of Martinolich in 1961; that on November 13, 1961, although he had no interest at this time in Martinolich Construction Company, Martinolich drew a certified check for Two Hundred Thousand Dollars ($200,000) upon the account of Martinolich Construction Company payable to Refrigerated Transport Co.

9. That when Martinolich Shipbuilding Co. was liquidated and dissolved, Martinolich received four one hundred thousand dollar notes from the purchaser, National Steel and Shipbuilding Company; that the first note was paid, the second discounted by Martinolich at fifteen per cent, and the third and fourth notes were assigned to Dalitz for One Hundred Thousand Dollars ($100,000), a fifty per cent discount; that Dalitz subsequently sold one of the notes for Ninety-seven Thousand Dollars ($97,000) and the other, for approximately Ninety-three Thousand Four Hundred Dollars ($93,-400).

10. That the Defendant acted as trustee, agent and/or broker for taxpayers and for the corporations, as well as their attorney.

The Court could make further findings of fact based on the record, but it is unnecessary.

These intriguing bits of information of intricate and confusing financial transactions, a sort of "Tinker to Evers to Chance" financial baseball in which the taxpayers played an important role, do not, of themselves, prove wrong doing by the taxpayers, but the transactions ought to be fully disclosed in order that the special agents may discharge their responsibility to the Government in determining the correctness of taxpayers' returns. The reasons why business was done in the manner indicated cannot now be understood and should be brought to light. This cannot be done without the enforcement of the administrative summons, as modified by stipulations set forth supra. This, the Court must do unless there are legal reasons why it may not.

I agree with Government counsel that the records sought are relevant and material to the Government's inquiry into the correctness of the taxpayers' returns. I find no merit in the objections raised that the summons constitutes a general warrant or that it violates the Fourth Amendment of the United States Constitution. Local 174, Intern. Broth. of Teamsters, etc. v. United States, 9 Cir. 1956, 240 F.2d 387; Hubner v. Tucker, 9 Cir. 1957, 245 F.2d 35.

The objection that a three-year statute of limitation may have run is untenable. See Foster v. United States, 2 Cir., 265 F.2d 183, at 187.

Under Wild v. Brewer, 9 Cir. June 2, 1964, 329 F.2d 924, the three corporations involved here do not have the right to claim the privilege of the Fifth Amendment.

There remains only the question of the attorney-client privilege. If the parties cannot resolve this problem, all

records claimed privileged are hereby ordered to be delivered to the Court for an in camera inspection and determination of the validity of the claim of privilege. Chapman v. Goodman, 9 Cir. 1955, 219 F.2d 802.

It is ordered that the Defendant produce those records described in the summons, in his possession, of financial transactions of either or both of the taxpayers with Martinolich Construction Company, Refrigerated Transport Co. and Martinolich Shipbuilding Co., and the financial transactions among the three corporations that bear, directly or indirectly, upon financial transactions of either or both of the taxpayers for the period involved, excluding financial transactions among the three corporations and between any of the three corporations and third parties that in no way pertain to, bear upon or affect financial transactions of either or both of the taxpayers.